# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ACS CONSULTANT COMPANY, INC.,**
        Plaintiff,

v.          Case No. 08C0803

**AGNESIAN HEALTH CARE,**
        Defendant.

## DECISION AND ORDER

Plaintiff ACS Consultant Company, Inc. ("ACS"), brings this action for breach of contract and unjust enrichment against defendant Agnesian Healthcare, Inc. Agnesian filed a counterclaim alleging breach of contract. I have jurisdiction because the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Before me now are ACS's motion for partial summary judgment and Agnesian's motion for summary judgment.

## I. BACKGROUND

Agnesian is a regional healthcare system that operates various medical facilities in the Fond Du Lac area. In 2003, it entered into a contract with ACS (actually, ACS's predecessor, Superior Consultant Company, but this detail can be ignored) in which ACS agreed to provide various information-technology services to Agnesian. Generally speaking, in exchange for a single fee, ACS agreed to take over the functions previously performed by Agnesian's information-technology department – i.e., management of Agnesian's computers, telephones, and the like. The specific services ACS agreed to perform were, for the most part, described in six "service statements" attached to the contract. Each service statement dealt with a different type of service, and the statement

at issue in the present case is the sixth statement, which deals with "voice network services" – i.e., telephones and related technologies. In 2006, the parties entered into an amended and restated version of this contract (the "ARMA"), but the differences between the original and amended contract are not relevant to this case, and so I write as if there were only a single contract.

The parties' dispute arises from the fact that since the outset of their contractual relationship ACS has been paying the bills of Agnesian's various third-party telecommunications carriers – i.e., Agnesian's long-distance phone bills, internet bills, etc. In early 2007, ACS's executives began to wonder why ACS was paying these bills. One executive asked Steve Kinn, the individual at ACS in charge of the Agnesian account, about the matter. Kinn indicated that, because of a "sales screw up," ACS was responsible for the bills. Kinn added that the sales screw up was causing ACS to lose $800,000 per year on the Agnesian account.

ACS then referred the matter to its legal department, and the lawyers concluded that the contract with Agnesian did not actually require ACS to pay Agnesian's carrier bills. ACS thus asked Agnesian to begin paying its own bills and to reimburse ACS for a portion of the bills that it had already paid. Agnesian refused, contending that when it hired ACS to provide information-technology services in exchange for a single fee, it expected that single fee to cover the relevant carrier expenses. Agnesian thought the parties' contract reflected this expectation.

Although ACS disagreed with Agnesian's understanding of the parties' contract, it continued to pay some of the carrier bills until Agnesian terminated the contract on May 31, 2008. ACS then initiated this lawsuit, seeking restitution of the amounts it paid to

2

Agnesian's carriers over the duration of the parties' relationship, which totals $3,320,050.15. Agnesian counterclaimed, seeking reimbursement for carrier bills that it claims ACS did not pay. Both parties have moved for summary judgment, each contending that the contract's unambiguous language requires judgment in its favor.

## II. ANALYSIS

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties agree that Wisconsin substantive law governs this dispute. Under Wisconsin law, a court interpreting a contract seeks to ascertain the parties' intent. See, e.g., Town Bank v. City Real Estate Development, LLC, __ N.W.2d __, 2010 WL 5599973, at *6 (Wis. 2010). The best indication of the parties' intent is the language of the contract itself, and if the contract is unambiguous, the court may not consider extrinsic evidence concerning the parties' intent. However, if the contract is ambiguous – meaning that its language is susceptible to more than one reasonable interpretation – then extrinsic evidence may be considered. Id.

ACS's position that Agnesian should have been paying its own carrier bills depends on a provision found in one of the service statements attached to the parties' contract, Service Statement No. 6. That statement governs "voice network services" and generally provides that ACS would operate and manage Agnesian's telephone systems. The statement also contains a "Responsibility Matrix," which is a table that specifies 115 separate activities or tasks involved in the provision of voice network services. Each activity or task is itemized on a row of the table, and the corresponding columns indicate

3

whether responsibility for the activity or task belongs to ACS, Agnesian, or both parties jointly. The relevant portion of the Responsibility Matrix is reproduced below.

|  | **Voice Services** | **ACS** | **Agnesian** |
|---|---|---|---|
|  | ***Voice Billing Management*** |  |  |
| 112. | Provide and maintain bill management for all dial tone, cable modem, cell phone, pager, data, and circuit billings from carrier(s) | ✓ | ✓ |
| 113. | Proactively manage carrier bills to reduce mis-charges, non discounted rates or inappropriate charges | ✓ | ✓ |
| 114. | Assure carriers are paid appropriately to avoid late charges, or service interruptions |  | ✓ |
| 115. | Monitor and analyze trends to optimize utilization and consumption. | ✓ | ✓ |

ACS contends that the plain meaning of Item 114 of the Responsibility Matrix is that Agnesian was required to pay its own carrier bills. However, the responsibility assigned by Item 114 is the responsibility to "assure carriers are paid appropriately." This is different than a responsibility to actually pay carriers. One can assure payment without actually making payment oneself, and thus Item 114 does not literally require Agnesian to pay its own bills. Nonetheless, Item 114 does seem to assume that someone other than ACS would be making the payments (either Agnesian or one of its agents, such as an accountant), since it would be peculiar to require Agnesian to assure that ACS paid Agnesian's bills on time. Thus, if Item 114 were the only provision of the contract touching on payment of carrier bills, Agnesian would have no basis for claiming that the parties intended that ACS would be responsible for paying those bills.

4

The problem for ACS is that other provisions of the contract – those dealing with the "Agnesian Base Case" – indicate that ACS was responsible for paying Agnesian's carrier bills. The Agnesian Base Case is a list of the information-technology expenditures that Agnesian expected to incur in fiscal year 2003. (ARMA at p. 65 & Schedule 1.5.) During negotiations, ACS asked Agnesian to prepare this list so that ACS could calculate the cost of taking over Agnesian's information-technology department and determine its fee. The parties then incorporated the list into their contract. (ARMA, Schedule 1.5.) The contract states that "[i]f there are services, functions, responsibilities or tasks not specifically described" in the contract that are "reflected in and contemplated by the Agnesian Base Case," then "such functions, responsibilities and tasks shall be deemed to be implied by and included within the scope of the Services to the same extent and in the same manner as if specifically described in the applicable Service Statement." (ARMA § 1.5(b).) The contract further states that ACS would be responsible for providing any services implied by the Base Case. (Id.)

The Base Case schedule includes various line items for communications services, including telephone services. Agnesian submits an affidavit stating that these line items reflect the services provided by the third-party carriers whose bills are at issue in the present case. (Little Aff. ¶¶ 15-16.) ACS does not offer a contrary interpretation of the

relevant line items.[1] Thus, the undisputed facts establish that the carrier bills at issue in the present case are "reflected in and contemplated by the Agnesian Base Case."[2]

ACS correctly points out that even if the carrier bills are included in the Base Case, they would not be ACS's responsibility if a specific provision of the contract stated that responsibility for paying the bills was Agnesian's. ACS then points to Item 114 once again, reiterating its belief that this provision assigns responsibility for paying the bills to Agnesian. However, as discussed, Item 114 does not say that Agnesian was required to pay its own carrier bills; it says that Agnesian was required to assure that someone paid them. Thus, the literal language of Item 114 does not displace ACS's agreement to assume payment of the carrier bills as implied by the Base Case. However, as also noted, it is unlikely that

---

[1] Although ACS does not offer a contrary interpretation, ACS seems to contend that Agnesian's explanation of the Base Case line items is an impermissible attempt to use extrinsic evidence. However, the line items are all ambiguous, in that none of them identifies a specific bill or contract, and thus some additional explanation is needed to determine whether any specific expense is included in the Base Case. See Town Bank, __ N.W.2d at __, 2010 WL 5599973, at *6 (extrinsic evidence may be considered where contract's language is ambiguous).

[2] In an attempt to show that the carrier bills are not reflected in and contemplated by the Base Case, ACS points to Section 4.4 of the contract and Schedule 4.4. Section 4.4 and Schedule 4.4 deal with various third-party contracts relevant to the contract between Agnesian and ACS. Section 4.4 states that Schedule 4.4 identifies all third-party contracts that were in effect as of the start of ACS and Agnesian's contractual relationship. Schedule 4.4 then indicates whether ACS was assuming those contracts or whether the contracts would remain with Agnesian. Schedule 4.4 does not list the carrier bills at issue in this case. ACS contends that if Agnesian thought ACS was assuming liability for the carrier bills, Agnesian would have listed those bills on Schedule 4.4, and the Schedule would then have indicated that ACS was assuming liability for the bills. However, the contract provisions relating to the Base Case do not refer to Section 4.4 or Schedule 4.4. Moreover, Section 4.4 recognizes that ACS may have inadvertently left contracts off of Schedule 4.4 (ARMA § 4.4(e)), and the whole point of the Base Case was to assign responsibility for any services that the parties inadvertently failed to describe elsewhere in their agreement. Thus, the failure to list the carrier bills on Schedule 4.4 is not inconsistent with ACS having assumed liability for those bills pursuant to the Base Case provisions.

the parties would have agreed to an arrangement in which Agnesian was required to assure that ACS paid Agnesian's bills. Interpreting Item 114 and the Base Case provisions in accordance with their literal meanings thus leads to an absurd or unreasonable result – i.e., a result that "the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek." Beanstalk Group, Inc. v. AM General Corp., 283 F.3d 856, 860 (7th Cir. 2002).

In an attempt to provide a rational explanation for an arrangement in which Agnesian is responsible for assuring payment of bills that ACS is responsible for paying, Agnesian notes that ACS did not agree to assume all of Agnesian's carrier bills. Although Agnesian listed most of its third-party carrier expenses on the Base Case schedule, it did not list its local dial tone expenses. The reason for this was that each working department at Agnesian was responsible for its own local dial tone expenses, and so these expenses were included on the budgets of the various working departments and were not part of Agnesian's information-technology budget. When Agnesian hired ACS, it only expected ACS to provide the services that were previously part of the information-technology budget. Since local dial tone services were not part of the information-technology budget, they were not included in the Base Case or otherwise assigned to ACS in the contract. Thus, although the Base Case assigned responsibility for many third-party carrier services to ACS, it did not assign responsibility for local dial tone expenses.

Agnesian states that, in light of the above, Item 114 can be understood as requiring Agnesian to assure payment of the local dial tone bills. But Item 114 requires Agnesian to assure payment of all carrier bills, not just local dial tone bills, and Agnesian does not explain why Agnesian was solely responsible for assuring payment of all bills when it was

7

responsible for paying only a small subset of them. Indeed, if both parties had carrier bills that they were responsible for paying, why didn't the parties place checkmarks in both ACS's and Agnesian's columns, indicating that the responsibility for assuring payment of all carrier bills was a joint responsibility?

The lack of a rational explanation for the state of affairs produced by interpreting Item 114 and the Base Case provisions in accordance with their literal meanings indicates that the literal meanings are not necessarily indicative of the parties' intent. Corbatt v. Joannes, 104 N.W. 69, 75 (Wis. 1905) (court may consider extrinsic evidence as to parties' intent where literal interpretation of contract produces an absurd result); In re Airadigm Comm'cns, Inc., 616 F.3d 642, 664 (7th Cir. 2010) (applying Wisconsin law and stating that court will not follow a literal interpretation of a contract when to do so would lead to an unreasonable or absurd result); Bank of America, N.A. v. Moglia, 330 F.3d 942, 946 (7th Cir. 2003) (where literal interpretation of contract would produce absurdity, contract will not be interpreted literally). Once the literal meaning of Item 114 is set aside, it is not clear from the language of the contract what the parties' intended when they assigned Agnesian the responsibility to "assure carriers are paid appropriately." Did they mean that Agnesian would actually pay the carriers? That Agnesian would assure that all carrier bills were forwarded to ACS for payment in a timely fashion? Or, as Agnesian suggests, did they mean that Agnesian would assure payment of all local dial tone bills? Because all of these possibilities are reasonable, I conclude that Item 114 is ambiguous and that therefore extrinsic evidence may be considered.

Once a court decides to consider extrinsic evidence, determining the parties' intent usually becomes a job for the trier of fact. See Matthews v. Wis. Energy Corp., Inc., 534

F.3d 547, 556 (7th Cir. 2008) (applying Wisconsin law). However, all of the extrinsic evidence in the summary-judgment record supports Agnesian's interpretation of the contract. ACS does not dispute that after the parties entered into their contract ACS paid the carrier bills without objection for more than four years. This is strong evidence that the parties did not understand Item 114 as requiring Agnesian to pay the carriers itself. See Zweck v. D P Way Corp., 70 Wis. 2d 426, 435 (1975) (practical construction of ambiguous term that parties have adopted is strong evidence of intended meaning) ; Jorgenson v. Northern States Power Co., 60 Wis. 2d 29, 35 (1973) (same). Moreover, Steve Kinn was the ACS employee in charge of the Agnesian account, and he states he believed up until 2007, when ACS's legal department got involved in the matter, that "ACS had payment responsibility for carrier and other telecommunication charges." (Kinn Aff. [Docket #52-1] ¶ 23.) Although Kinn also states that his understanding was not based on a legal interpretation of the contract, that is irrelevant. What is relevant is that Kinn – the ACS employee in charge of the Agnesian account – thought that ACS and Agnesian had agreed as part of their bargain that ACS would pay the carrier bills. This indicates that the parties did, in fact, agree that ACS would pay the bills. If the parties did not so agree, why did Kinn think that they did? ACS does not try to answer this question, and thus the conclusion that the parties agreed to this arrangement is inescapable. If ACS had offered a plausible explanation for why it paid the bills for four years, then perhaps a reasonable trier of fact could have credited that explanation and interpreted Item 114's language about assuring payment as meaning that the parties had intended to assign responsibility for paying the carrier bills to Agnesian. But as it stands, the record permits a reasonable trier of fact to reach only one conclusion – that the parties intended to allocate responsibility for paying

9

the bills to ACS. Agnesian is therefore entitled to summary judgment on ACS's claim for reimbursement. See Sound of Music Co. v. Minn. Mining & Mfg. Co., 477 F.3d 910, 916 (7th Cir. 2007) ("If the extrinsic evidence is conclusive, the proper reading of the contract is not a question of fact."); ConFold Pacific, Inc. v. Polaris Indus., Inc., 433 F.3d 952, 956-57 (7th Cir. 2006) (stating that summary judgment is appropriate where consideration of extrinsic evidence and language of contract would permit trier of fact to come to but one conclusion).

The remaining matter is Agnesian's counterclaim against ACS, in which it claims that ACS failed to pay nineteen specific carrier bills covered by the Base Case provisions. ACS responds to Agnesian's motion for summary judgment on the counterclaim by stating that it paid many of these bills, that it paid certain other bills on a prorated basis through the date of termination of the contract, and that many of the unpaid bills are for services unrelated to the carrier services implied by the Base Case. However, ACS concedes that certain of the unpaid bills were for services implied by the Base Case – specifically, Items 2, 12, 15 and a part of 18. For unknown reasons, Agnesian did not file a reply brief in support of its motion for summary judgment as permitted by Civil Local Rule 56(b)(3), and thus Agnesian had not responded to ACS's claim that it paid certain bills and that other bills are not bills for carrier services. I therefore treat ACS's statement of additional facts relating to Agnesian's counterclaim (Docket #52 at pp. 27-33) as undisputed. Based on these facts, by my calculation ACS owes Agnesian $1,557.27 for unpaid bills relating to carrier services implied by the Base Case and incurred prior to termination of the contract (sum of Items 2, 12, 15 & 18, where balance on 18 is $867.83). Agnesian's motion for

summary judgment on its counterclaim will therefore be granted to the extent that judgment will be entered in its favor and against ACS in the amount of $1,557.27.

## III.  CONCLUSION

For the reasons stated, the undisputed facts establish that ACS was contractually obligated to pay the Agnesian carrier bills relating to services implied by the Base Case. Summary judgment will therefore be granted in favor of Agnesian on ACS's claims for breach of contract and unjust enrichment.  Furthermore, the undisputed facts establish that ACS is required to pay Agnesian $1,557.27 for unpaid charges relating to carrier bills. Summary judgment will therefore be entered on the counterclaim in the amount of $1,557.27.

In a footnote in its motion for partial summary judgment, ACS indicates that it has a claim for $500,000 in telecommunications expenses that it did not address in the motion. (Docket #45 n.1.)  It does not appear that Agnesian has moved for summary judgment on this claim, and it is unclear whether ACS intends to pursue the claim further.  Unless ACS notifies me within ten days of the date of this order that it intends to pursue this claim, I will assume that it does not intend to do so and will direct the Clerk of Court to enter final judgment.

**THEREFORE, IT IS ORDERED** that ACS's motion for partial summary judgment on its breach of contract and unjust enrichment claims is **DENIED** and that Agnesian's motion for summary judgment on ACS's breach of contract and unjust enrichment claims is **GRANTED**.

**IT IS FURTHER ORDERED** that summary judgment is entered in favor of Agnesian on its counterclaim in the amount of $1,557.27.

**FINALLY, IT IS ORDERED** that unless ACS notifies me within ten days of the date of this order that it intends to pursue any remaining claims, the Clerk of Court will be directed to enter final judgment.

Dated at Milwaukee, Wisconsin, this 28th day of February, 2011.

/s_____
LYNN ADELMAN
District Judge